IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| STEPHEN H. LEBOVITZ, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| | ) | |
| vs | ) | Civil Action No. 11-1014 |
| | ) | |
| HARTFORD INSURANCE COMPANY | ) | |
| OF THE MIDWEST, | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

I. <u>Recommendation</u>:

It is respectfully recommended that the defendant's motion for partial summary judgment on the plaintiff's claims of disability resulting from cognitive impairment, concussion symptoms or an inability to work as a lawyer beyond November 20, 2007 (Document No. 47) be denied.

II. <u>Report</u>:

In this insurance coverage dispute, the defendant, Hartford Insurance Company of the Midwest ("Hartford"), moves for partial summary on the plaintiff's claims of disability related to cognitive impairment, concussion symptoms or an inability to work as an attorney beyond November 20, 2007. For reasons discussed below, Hartford's motion for partial summary judgment should be denied.

The plaintiff, Stephen H. Lebovitz, commenced this action in the Court of Common Pleas of Allegheny County, PA, seeking to recover up to $2 million in uninsured motorist ("UM") benefits under an insurance policy issued by Hartford. On August 5, 2011, Hartford filed a timely notice of removal to this Court, and it is undisputed that the Court has jurisdiction over

1

this matter pursuant to 28 U.S.C. § 1332.[1]

The insurance policy in question was issued by Hartford to the plaintiff's parents for the period 01-06-07 to 01-06-08 and covered (4) vehicles with stacked UM coverage of $500,000 per vehicle for a total of $2 million (Complaint at ¶ 2 and Answer thereto). The UM portion of the policy requires Hartford to "pay compensatory damages which an insured is legally entitled to recover from the owner or operator of an uninsured motor vehicle because of bodily injury: 1. Sustained by an insured; and 2. Caused by an accident. The owner's or operator's liability for these damages must arise out of the ownership, maintenance or use of the uninsured motor vehicle." (See, Policy at p. 20 of 46, Form 8537, which is attached to the Complaint). Hartford does not dispute that the plaintiff is an "insured" for purposes of his UM claim; however, it disputes whether he suffered injury in an accident for which he is legally entitled to recover from the operator of the alleged vehicle involved in the accident.[2]

The plaintiff asserts that on September 4, 2007, he was injured while riding his bicycle in Pittsburgh, PA when an unidentified female motorist in a green sedan automobile recklessly turned her vehicle into his path, such that the vehicle's right side window struck the ride side of his bicycle helmet, causing him to be knocked to the ground (Complaint at ¶¶ 5, 10). The female motorist left the scene of the accident without providing her identification or any information (Id. at ¶¶ 6, 11). The plaintiff asserts that as a result of the accident, he sustained multiple injuries, including a C3 fracture, concussion, hematoma, bruises, contusions, and a traumatic brain injury causing him total disability (Id. at ¶ 5).

It is the plaintiff's contention that as a result of the accident, he suffers from concussion

---

[1] The plaintiff is an individual who resides in Pittsburgh, PA; Hartford is an Indiana corporation with its principal place of business in Hartford, CT; and the amount in controversy exceeds the statutory limit.

[2] See, Hartford's Memorandum in support of its current motion at p.2, n.3.

symptoms, including cognitive impairments, fatigue, headaches, nausea, anxiety, inability to sleep and other maladies, all of which are exacerbated by attempts at cognitive or physical exertion (Defendant's Concise Statement of Material Facts ["DSMF"] at ¶ 3 and plaintiff's response thereto). Consequently, the plaintiff avers that he is totally and permanently disabled from any and all employment, including his pre-accident profession as an attorney (Id. at ¶ 4).

At the plaintiff's deposition held on March 12, 2012, he testified that since the occurrence of the accident on September 4, 2007, he continues to experience the following symptoms in a typical day: dizziness in his head that can lead to nausea; trouble maintaining his concentration or keeping track of multiple things; trouble reading and keeping his eyes fixed on words beyond a few lines of text; bad headaches; and fatigue when he exerts himself physically or cognitively (Plaintiff's deposition at pp. 23-27 [Doc. 49-2]). In a May 13, 2008 Intake Evaluation from ReMed Rehabilitation Clinic of Pittsburgh, it was reported that the plaintiff's "typical day consists of getting out of bed, preparing a simple breakfast, attending therapy, walking, meeting a friend for lunch, sitting outside, listening to music and running errands" (Doc. 49-5).

Hartford asserts that following the accident, the plaintiff treated with several doctors and regularly reported to them the subjective concussion symptoms described above. It also avers that presently, the plaintiff continues to self-report that all physical and cognitive exertion renders him symptomatic and fatigued. However, Hartford disputes whether the plaintiff suffers from any continuing symptoms related to the accident beyond an approximate two month period, after which all objective testing showed that he had recovered from his accident-related injuries.

For instance, Hartford points to the deposition testimony of Dr. Michael Collins, the plaintiff's treating neuropsychologist. The plaintiff treated with Dr. Collins the day following

his accident, and Dr. Collins diagnosed him as having sustained a mild traumatic brain injury (DSMF at ¶ 5 and plaintiff's response thereto). In a deposition dated February 17, 2012, Dr. Collins testified that he evaluates traumatic brain injuries by using the "ImPACT test", which is a 25 minute cognitive test administered on a computer that measures the functionality of the brain through cognitive processes (Dr. Collins deposition at pp. 18-20 [Doc. 49-4]). Dr Collins first examined the plaintiff on September 5, 2007, and after administering the ImPACT test, he diagnosed the plaintiff with having sustained a cerebral concussion (Id. at pp. 7-8, 20-21). On September 14, 2007, Dr. Collins again used the ImPACT test on the plaintiff, the results of which showed he had improved significantly (Id. at p. 26). However, at a follow-up exam with the plaintiff on September 27, 2007, Dr. Collins administered the ImPACT test, but it showed a regression, as the plaintiff's scores dropped considerably (Id. at pp. 31-32).

The plaintiff was given the ImPACT test again on October 23, 2007, and test results revealed "profound improvements" (Id. at p. 38); Dr. Collins attributed the inconsistency in the plaintiff's ImPACT test results to possible bouts of anxiety, visual system issues, and personality attributes (Id. at pp. 38-43). On November 20, 2007, the plaintiff was given another ImPACT test which showed "[t]hree out of four scores were normal"; and while "[h]is reaction times were at the low limits of the average range,… they were impressive" (Id. at p. 46). That day, Dr. Collins performed extra neuropsych testing on the plaintiff, and "those tests were normal as well" (Id. at pp. 46-47). Thereafter, with the exception of "one data point where he dropped pretty significantly again", the plaintiff's ImPACT test results were normal (Id. at p. 59). The last time Dr. Collins gave the plaintiff an ImPACT test, in October of 2011, "[h]e was entirely normal", and "the best I had ever seen him on that test" (Id.).

In questioning the plaintiff's subjective injury claims, Hartford also presents evidence

4

which shows that the plaintiff has engaged in myriad activities which dramatically contrast from the limitations he self-reports to his treating doctors. As examples, Hartford has shown that the plaintiff attended polo matches a week after the accident (Defendant's Exhibit G [Doc. 49-5]); attended boxing matches at the Pittsburgh Athletic Association less than two months from the accident and several times thereafter (Plaintiff's deposition at pp. 157-58, 451-52 [Docs. 49-2 and 49-3]); regularly attended Steeler football games every year since the accident (Id. at p. 452); regularly engaged in exercise, including running, swimming, playing tennis, walking and participating in yoga sessions (Id. at pp. 148-49, 155-56, 248-54, 445, and 453); posted hundreds of comments on technical websites, such as the Samsung developers forum, where he engaged in discussions concerning the Android phone operating system (Id. at pp. 70-81); performed computerized legal research at the request of his father/lawyer, and entered appearances in multiple pending legal matters, where he signed documents and pleadings to be filed with the courts (Id. at pp. 380-86, 399-410, 415-18, 425-28, 434-38, 453-54); and regularly traveled by airplane, including taking day trips to New York for personal and business reasons, to Las Vegas where he gambled and visited hotels/casinos just a few months after the accident, to Arizona to visit friends and to sight-see, and to Florida and Maine, where he spends several weeks per year at his family's vacation homes (Id. at pp. 125-34, 136-42, 391-97, 446, 450-51).

  Hartford also asserts that the plaintiff deceived his treating physicians regarding his prior mental health history. As discussed above, the plaintiff treated with Dr. Collins in the days following his accident. In October 2007, the plaintiff was referred for treatment to a physiatrist, Dr. Cara Camiolo-Reddy, due to his complaints of concussion-like symptoms (DSMF at ¶ 6 and plaintiff's response thereto). Both Dr. Collins and Dr. Camiolo-Reddy asked the plaintiff if he had any pre-accident mental health issues or treatment, to which the plaintiff responded that he

5

had no pre-accident mental health history (Id. at ¶¶ 7-8).

The record shows that in 2004, the plaintiff's treating physician, Gary Fischer, M.D., prescribed to him a 12-month supply of the anti-depressant/anti-anxiety drug Paxil (Id. at ¶ 11). Dr. Fischer issued that prescription to the plaintiff to address what he diagnosed as an "adjustment disorder", accompanied by the plaintiff's symptoms of feeling "very depressed" and having "difficulty sleeping and concentrating" at a time when the plaintiff was having marital problems (Dr. Fischer deposition at p. 30-33 [Doc. 50-2 at pp. 63-66 of 291]. However, Dr. Fischer testified that he believed the plaintiff's symptoms were "anxiety-related" and did not meet the criteria for a depressive disorder; that he prescribed Paxil to the plaintiff to help with his symptoms; and that Dr. Fischer did not think that the plaintiff's symptoms were severe enough to diagnose him with depression (Id. at pp. 27-28, 30-33). Indeed, the plaintiff denies having any pre-accident mental health issues that required him to seek a psychiatrist or psychologist for treatment (Plaintiff's response to DSMF at ¶¶ 7, 10). Hence, the plaintiff denied any pre-accident mental health history to every doctor with whom he treated in relation to his bike accident (DSMF at ¶ 10 and plaintiff's response thereto).

Hartford points out that Dr. Collins and Dr. Camiolo-Reddy were surprised to learn of the plaintiff's aforesaid activities following his accident, as well as his being prescribed Paxil in 2004 (Dr. Collins deposition at pp. 9-11, 32-34, 51-58, 69-71 [Doc. 49-4]; and Dr. Camiolo-Reddy deposition at pp. 20-23, 27-30, 35-37, 73-74, 137-143 [Doc. 49-17]). Hartford also avers that ultimately, Dr. Collins concluded that notwithstanding the plaintiff's subjective injury claims, he does not believe that the plaintiff is "totally disabled" (Dr. Collins deposition at pp. 71-72 [Doc. 49-4]). Dr. Collins acknowledged that he had not seen the plaintiff in about 1½ years and had "lost touch in this case" (Id. at p.72); however, Dr. Collins testified that the

plaintiff is "able to think", and as far as his ability to think, he can work as a lawyer (Id. at p. 84). Hartford also cites to the February 10, 2012 deposition of Dr. Camiolo-Reddy, who testified that she had "some doubt" about whether the plaintiff was disabled from any type of work (Dr. Camiolo-Reddy deposition at p. 135 [Doc. 49-17]). She also stated that after learning that the plaintiff was treated with Paxil and having seen a report from Dr. Gorski, she had "some concerns" that the plaintiff's problems were related to psychological issues and not necessarily a traumatic brain injury (Id. at pp. 108-109).

Based on the foregoing, Hartford insists that the plaintiff cannot adduce any admissible medical expert testimony to support his subjective injury claims beyond November 20, 2007, when his objective test results were deemed normal. Thus, Hartford moves for partial summary judgment on the plaintiff's claims of disability resulting from cognitive impairment, concussion symptoms, or an inability to work as a lawyer after November 20, 2007.

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). We believe that the defendants' motion for partial summary judgment should be denied. That is because evidence shows that the plaintiff currently suffers from convergence insufficiency and cognitive deficits that may prevent him from working as an attorney.

Significantly, Dr. Collins did not testify that the plaintiff has recovered from his bike accident, has no cognitive deficits or emotional symptoms and is now able to return to work. Rather, in his deposition, Dr. Collins testified that recovery from non-traumatic brain injury is "very gray" and is influenced by a lot of different factors; that he tried every possible treatment on the plaintiff, including ten different medications, cognitive therapy, vestibular therapy, and vision therapy, and although the plaintiff was a compliant patient, none of the treatments were

7

successful; that while the plaintiff's test data looks good and is essentially within normal limits, he suffers from a convergence insufficiency that effects his vision and impacts how he can read; that Dr. Collins has "perhaps hundred[s] of other patients in that same situation and it's not often that someone like that would be able to get back to work based upon their cognitive functions"; and that Dr. Collins would like to see the plaintiff return to work "when he's able" (Dr. Collins deposition at pp. 38, 43, 59, 60, 72, 79, 81, 84-85 [Doc. 49-4]).

In addition, the plaintiff submitted an affidavit from Dr. Collins dated June 15, 2012. In his affidavit, Dr. Collins asserts that as a result of the plaintiff's bike accident, he sustained a C3 fracture, multiple contusions, and mild traumatic brain injury resulting in cognitive deficits, vestibular-ocular difficulties, fatigue, headaches, nausea, dizziness, and neurobehavioral changes in the form of anxiety; that these symptoms were exacerbated by cognitive and physical exertion; that the plaintiff did not recover from his accident by November 20, 2007; that it is Dr. Collins' opinion that the plaintiff currently exhibits mild and circumscribed cognitive deficits and emotional symptoms in the form of anxiety; and that the impairment to the plaintiff is stated with reasonable neuropsychological certainty (Plaintiff's Exhibit 1(a) [Doc. 50-2] at p. 1 of 291).

Dr. Camiolo-Reddy also executed an affidavit dated June 19, 2012. In her affidavit, Dr. Camiolo-Reddy avers that she first treated the plaintiff on October 8, 2007 upon referral from Dr. Collins stemming from the plaintiff's bike accident; that the plaintiff did not recover from his accident by November 20, 2007; that she last saw the plaintiff on May 30, 2012 for post-concussion symptoms and would like him to use Klonopin and Ambien prn for symptom control; that she referred the plaintiff for a neurosurgery consult with Joseph Maroon, M.D.; that it is documented that the plaintiff becomes cognitively impaired upon mental exertion which limits his activities as a result of the accident; that presently, the plaintiff is not in a position to meet the

8

responsibilities of a practicing attorney as he did prior to his accident; and that the impairment to the plaintiff is stated with reasonable medical certainty (Plaintiff's Exhibit 1(c) [Doc. 50-2] at p. 12 of 291).

In response to the affidavits of Dr. Collins and Dr. Camiolo-Reddy, Hartford argues that they are "sham affidavits" which should not be considered by the Court. We disagree.

A "sham affidavit" is one that contradicts the affiant's prior deposition testimony and indicates that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment. Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007). Under the "sham affidavit" doctrine, a court recognizes that a witness' deposition will usually be more reliable than his affidavit, since the deponent was either cross-examined or available for cross-examination by opposing counsel, whereas an affidavit is usually drafted by counsel, whose familiarity with summary judgment procedures may render the affidavit less credible. Id. If an affidavit is deemed a sham and offered solely to defeat summary judgment, "it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit evidentiary weight". Id.

Clearly, "not all contradictory affidavits are necessarily shams." Jiminez, 503 F.3d at 254, citing Baer v. Chase, 392 F.3d 609, 625 (3d Cir. 2004). Indeed, "merely because there is a discrepancy between deposition testimony and the deponent's later affidavit a district court is not required… to disregard the affidavit." Baer, 392 F.3d at 625. For instance, "[w]hen there is independent evidence in the record to bolster an otherwise questionable affidavit, courts generally have refused to disregard the affidavit." Jiminez, 503 F.3d at 254, citing Baer, 392 F.3d at 625. That is because evidence that corroborates a later affidavit alleviates the concern that an affiant filed an erroneous certification out of desperation to avoid summary judgment.

9

Baer, 392 F.3d at 626.

Further, courts hold that "an affidavit is not a sham if the affiant did not have all available information at the time of the deposition or the subsequent affidavit clarifies or further elaborates upon ambiguous testimony." Brown v. Showboat Atlantic City Propco LLC, 2010 WL 5237855, *4 (D.N.J., Dec. 16, 2010) (citing cases). In those cases, an affidavit is not deemed a sham, as it "do[es] not flatly contradict deposition testimony and, therefore, a reasonable jury may find the affidavit credible and conclude that any discrepancy is inadvertent." Id.

Here, the affidavits of Dr. Collins and Dr. Camiolo-Reddy are not shams. First of all, there is evidence in the record that corroborates their affidavits. Second, their affidavits clarify or elaborate upon their prior deposition testimony.

As recited above, Dr. Collins stated at his deposition that the plaintiff is not "totally disabled", and so far as his ability to think, he can work as a lawyer (Dr. Collins deposition at pp. 71-72, 84 [Doc. 49-4]). However, Dr. Collins also testified that recovery from non-traumatic brain injury is "influenced by a lot of different factors" (Id. at p. 38); that while the plaintiff's test data is essentially within normal limits, he suffers from a convergence insufficiency that effects his vision (Id. at pp. 60, 72, 79-81, 84-85); that Dr. Collins has "perhaps hundred[s] of other patients in that same situation and it's not often that someone like that would be able to get back to work based upon their cognitive functions" (Id. at p. 72); and that Dr. Collins would like to see the plaintiff return to work "when he's able" (Id. at p. 84). In diagnosing the plaintiff with a convergence insufficiency, Dr. Collins explained that he relied on reports from Dr. Furman and Dr. Steinhafel (Id. at pp. 60-61, 72).

In his affidavit, Dr. Collins does not contradict his prior deposition testimony. Rather, Dr. Collins asserts in his affidavit that as a result of the plaintiff's accident, he sustained a "mild

10

traumatic brain injury resulting in cognitive deficits, vestibular-ocular difficulties, fatigue, headaches, nausea, dizziness, and neurobehavioral changes in the form of anxiety"; that these symptoms were exacerbated by cognitive and physical exertion; that the plaintiff did not recover from his accident by November 20, 2007; and that it is Dr. Collins' opinion, stated with reasonable neuropsychological certainty, that the plaintiff "currently exhibits mild and circumscribed cognitive deficits and emotional symptoms in the form of anxiety", for which Dr. Collins referred him for cognitive therapy (Plaintiff's Exhibit 1(a) [Doc. 50-2] at p. 1 of 291).

With respect to Dr. Camiolo-Reddy, she first treated the plaintiff on October 8, 2007 upon referral by Dr. Collins. The record shows that Dr. Camiolo-Reddy was deposed on January 15, 2010 in conjunction with a support hearing involving the plaintiff (Plaintiff's response to DSMF at ¶ 6, and Dr. Camiolo-Reddy's deposition dated February 19, 2012 [Doc. 49-17] at p. 135). At her deposition on January 15, 2010, Dr. Camiolo-Reddy testified that the plaintiff has cognitive problems that include difficulty with memory and the overall processing speed with which he can follow a conversation, as well as not being able to easily express his thoughts; that if he is sufficiently fatigued, he also has problems reading; and that based on his current symptoms, she does not believe that the plaintiff could resume his law practice or engage in full-time or part-time work (Plaintiff's Exhibit 2(c)(3) [Doc. 50-2] at pp. 139, 143-145 of 291).

At her subsequent deposition dated February 10, 2012, Dr. Camiolo-Reddy stated that upon learning the plaintiff was treated with Paxil, and having seen a report from Dr. Gorski, she had "some concerns" that the plaintiff's problems were related to psychological issues and not necessarily a traumatic brain injury (Dr. Camiolo-Reddy deposition at pp. 108-109 [Doc. 49-17]). She further testified that she had "some doubt" about whether the plaintiff was disabled from any type of work (Id. at p. 135).

Importantly, in her affidavit dated June 19, 2012, Dr. Camiolo-Reddy explained that she last saw the plaintiff on May 30, 2012 for post-concussion symptoms (a session that occurred after her deposition on February 10, 2012). She also stated that she had an opportunity to review the aforesaid affidavit of Dr. Collins dated June 15, 2012, as well as the affidavit of Barry Cohen, O.D., F.C.O.V.D. dated June 14, 2012, and she concurs with them.

As previously mentioned, an affidavit is not deemed a sham "if the affiant did not have all available information at the time of the deposition or the subsequent affidavit clarifies or further elaborates upon ambiguous testimony." Showboat Atlantic City Propco, supra, 2010 WL 5237855, at 4. In her affidavit, Dr. Camiolo-Reddy avers that as a result of his accident, the plaintiff sustained a "mild traumatic brain injury resulting in cognitive impairment, vestibular problems, fatigue, headaches, nausea, dizziness, anxiety, inability to sleep [and] convergence insufficiency, … all of which are exacerbated by attempts at cognitive or physical exertion"; that "he becomes cognitively impaired upon mental exertion limiting his activities as a result of the accident"; that the plaintiff "is not in a position at the present time to meet the responsibilities of a practicing attorney as he did prior to the accident"; and that "[t]he impairment to [the plaintiff] is stated with reasonable medical certainty." (Plaintiff's Exhibit 1(c) [Doc. 50-2] at p.12 of 291).

The declarations of Dr. Camiolo-Reddy that the plaintiff suffers from convergence insufficiency and is not presently able to meet the responsibilities of an attorney are corroborated by other evidence, such as the deposition testimony of Nathan Steinhafel, D.O. Dr. Steinhafel was deposed on February 9, 2012, and he testified that he tested the plaintiff's eyes, and that the plaintiff "has convergence insufficiency" (Dr. Steinhafel deposition at p. 50 [Doc. 50-2 at p. 254 of 291]). When asked if the plaintiff's convergence insufficiency would prevent him from reading in a normal manner and working through an eight hour day as an attorney, Dr. Steinhafel

12

stated "absolutely", and that "[the plaintiff's] going to have a very hard time getting through his eight hour day if that's what you're asking" (Id.).

In addition, Barry Cohen, O.D., F.C.O.V.D., executed an affidavit dated June 14, 2012. In his affidavit, Dr. Cohen avers that he can state with a reasonable degree of medical certainty that as a result of the plaintiff's accident, "he suffers from convergence insufficiency and cognitive difficulty preventing him from adequately reading or resuming his practice of law at the present time" (Plaintiff's Exhibit 1(b) [Doc. 50-2] at p. 3 of 291). To buttress his opinion, Dr. Cohen states in his affidavit that he attached medical reports dated January 14, 2011, April 21, 2011, May 10, 2011, June 28, 2011 and November 1, 2011 that reflect his treatment of the plaintiff and the plaintiff's condition as a result of the accident (Id. at pp. 3-11 of 291).[3]

Based on the foregoing, we find that the affidavits of Dr. Collins and Dr. Camiolo-Reddy are not sham affidavits that were presented solely to defeat summary judgment. We also believe that there is sufficient evidence in the record to support the plaintiff's injury claims.

Therefore, it is recommended that the defendant's motion for partial summary judgment on the plaintiff's claims of disability resulting from cognitive impairment, concussion symptoms or an inability to work as a lawyer beyond November 20, 2007 (Document No. 47) be denied.

Litigants who seek to challenge this Report and Recommendation must seek review by the district judge by filing objections within fourteen (14) days of this date. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond to them. Failure to file timely objections will waive the right to appeal.

Dated: July 31, 2012

Respectfully submitted,

s/ROBERT C. MITCHELL
United States Magistrate Judge

---

[3] By text Order dated July 30, 2012, we denied Hartford's motion in limine to exclude expert opinions of Dr. Barry Cohen without prejudice to be renewed at the appropriate time.